and the final argued matter on today's calendar. Family Equality, True Colors United et al. v. Sarah, 22-1174. Good morning and may it please the court. Kristen Miller for plaintiffs. The challenge notice of non-enforcement has imposed an involuntary material burden on plaintiffs in two ways. First, it has made plaintiffs' education programs more time consuming and therefore more costly. And second, it has made those education programs less effective by preventing plaintiffs from relying on the 2016 grants rule as a training tool. This puzzles me. I'm sorry, why don't you go ahead. If any – wouldn't any change in regulations impact your efforts with relevant regulations in the same way, right? I mean, if you have materials prepared for educational programs, this is what the law is, and then there's a change in the regulation. You'd have to rejigger your materials. Well, Your Honor, two responses. First, I think there are different types of changes. For example, here we have gone from a single federal standard to a patchwork of standards. But isn't your problem really that you don't like the change that they made? In other words – well, I guess it doesn't matter if you would not choose to sue if they adopted a multiple complex system that was actually more favorable to your ultimate goals. So maybe that doesn't matter. But I'm just trying to figure out in terms of who has standing to challenge this sort of thing. Wouldn't anyone who is in your position as trying to advocate and educate be able to complain any time the agency moved from a simple standard to a more complicated one? Well, there is a limitation, Your Honor, on the pool of potential plaintiffs that would have similar standing. So in order to allege standing under this type of theory, an organization would need to likewise have educational programs that predate the challenge to action, and those educational programs would need to be similarly adversely affected. Sure, but anybody who's in the business of educating people in general about what the government requires is – I mean maybe you're saying I couldn't start an organization and then say, oh, I have a harder time doing this mission than I would have if I had started up years earlier and they hadn't changed the regulation. But isn't – I mean this means that any – and wouldn't your harm be or your remedy be to – they could be simple. Suppose they – I don't know what – I mean maybe it would be hard to conceive a simple thing that was also consistent with statutes. Well, to – just to give another example, Your Honor, if, for example, the agency had removed the nondiscrimination protections here, putting in place – leaving in place a patchwork and then in the future reimposed a single federal standard, that would actually simplify plaintiff's education work. So in that instance, it's not every single regulation. Why is there a right to simple regulations? Your Honor, plaintiffs do not assert a right to simple regulations. Plaintiff's cause of action here is grounded in the agency's failure to comply with the Administrative Procedure Act. And to bring that lawsuit, they simply have to show that the challenged agency action has adversely impacted their preexisting core activities. If they had exactly the same substantive violation but it resulted in a simplification of standards, then you wouldn't have standing to complain about their violation of the APA. I believe that's correct, Your Honor. If there were not injuries to plaintiffs' preexisting education programs – That would be an impairment of your – that would not constitute an impairment of your education programs. Right. If there were a simplification of the standard, the education programs would not be impaired in the way that they are here. Well, of course, you've got the other thing. I don't understand that. They simplified them so they were changed and you had to undergo the burden. It may have been less, but nonetheless a burden of communicating to your clients that here are the changes, here's the new deal, here's what you've got to do to comply. Well, Your Honor, so there are some short-term costs with updating and revising the materials in the first instance. So if there were a change in regulation that simplified the standard, plaintiffs might need to update their materials and revise their education programs to reflect the standard. But critically here, there may not be in that scenario ongoing, continued costs over the long term that accompany the current situation where plaintiffs have to educate their constituents on a patchwork of standards that vary across programs and vary across states. And those standards also are evolving at the state level as states introduce new legislation that are anti-LGBTQ in nature. What rule of decision would you have us adopt to give the public guidance about what kind of changes are actionable and what kind are not? Your Honor, I think that the standard here is whether or not plaintiffs can show that there is a concrete injury to their pre-existing established activities. Here, plaintiffs- But almost any change could conceivably cause that harm, and it's to a greater or lesser extent. There's no bright line here. And so what sort of workable test are we to fashion? Well, Your Honor, if you're worried about the extent of the harm, I think that this court has made clear in multiple cases that only a perceptible impairment of plaintiffs' activities is required. And that's consistent with Supreme Court case law, such as- What I'm arguing is that the allegations of the plaintiffs are sufficient to meet the Connecticut Parents Union standard. Correct, Your Honor. Correct, Your Honor. And to just distinguish those two cases, in Connecticut Parents Union, this court said plaintiffs need to show that there are pre-existing established activities that further their mission that have been negatively impacted in some way. And in that case, the plaintiffs were not able to meet that standard, because even though they engaged in some education on the challenged policy, they never alleged that the challenged policy impacted pre-existing education work. So there are three plaintiffs or organizations here. Correct. It seems to me that there are some differences between those three. In particular, I'm focused on SAGE. Yes, Your Honor. Tell me about SAGE and why that seems to be a zebra that's a little bit different from the rest of the herd. Well, SAGE is actually a little bit like True Colors United in that it educates service providers not only on their legal obligations to not discriminate, but also in that they provide training on how to not discriminate in practice. So both True Colors and United will explain, for example, that if you misgender an LGBTQ person, that is a form of discrimination. If you provide them in the homelessness shelter context for True Colors United, if you provide them with clothing that is inconsistent with their gender identity, that's discrimination. So both SAGE and True Colors engage in that kind of work and provide technical assistance and training to service providers along those lines. And what is it that SAGE needs to do differently as a result of the non-enforcement? I'm sorry, Your Honor. Can you repeat that? What is it that SAGE has been doing differently and was forced to do differently as a result of this non-enforcement? Yes, Your Honor. So SAGE has revised some of its education work to not only work directly with service providers, but also has conducted an outreach and education campaign on the legal impact of the notice with its partner organizations who in turn are conveying that information to service providers about what their new obligations are state by state. So SAGE can no longer directly tell service providers. You all are subject to the same single federal standard. That's no longer doable because there is no single standard that applies to all service providers. So instead they've- Because of the notice of non-enforcement. Because of the notice of non-enforcement, Your Honor. If I'm a law professor and I teach a course in discrimination law and I have a casebook, every time they change the regulations, I have to revise the casebook. Does that give me standing to challenge any change in regulations that I think violated the APA? No, Your Honor. I think that there are two reasons why not. First, in that scenario, you are not being injured in mission-driven activities. You're receiving a salary, presumably, to spend- Yeah, but I'm selling my casebook and I have a lot of other things I could do with my time that would be either lucrative or would enhance my academic reputation more than upgrading this casebook to reflect this new, more complicated regulation or this new simple regulation. I've got to do work when I'd rather be doing other kind of work. And I'm harmed. So I get a free shot at any regulation that I think is substantively unlawful that's in my field, yes? I don't think so, Your Honor, because- My mission is education and it's harder to do now. At least it makes me invest work and effort to change the law. And if they had complied with the APA, maybe they never would have been able to change the regulation. I don't- Again, Your Honor, I think that's not exactly right because if you update your casebook, presumably you will publish that casebook and receive royalties on- You'll forgive me, I'm not in academic publishing, so- It's good for me. I have to change the casebook every year because then I can sell new ones to all the students rather than the used ones in the marketplace. But the point is, if your mission is to educate people about the law, aren't you stuck with teaching the law as it is? I think that there's also another distinction here when you look at what the organization's missions here are and how the education relates to that mission. So specifically, plaintiff's missions here are to ensure that the LGBTQ communities can access these services that they are entitled to free of discrimination. And the education furthers that mission in a few ways. It's not just that the education itself is the mission. It's that the education both deters discrimination and empowers the LGBTQ community to advocate for themselves when they encounter that discrimination in practice. I think in that regard, plaintiffs here look much more like the plaintiffs in New York v. Department of Homeland Security where they were found to have standing based on similar educational injuries. So, for example, Catholic Charities was found to have standing in that case because the complexities of the public charge rule forced it to change its education from less time-intensive group sessions to more time-intensive- Yeah, that's what Catholic Charities said, and so we had like eight of them, and in one line in the opinion, we sort of grouped them all and said they all had standing. I'm not sure that that's a terribly strong place to hang your hat. Not to mention that that was kind of suggested to be a massive change in how they could possibly deal with their clients who were now frantic about whether they could do this or do that and were besieging them with calls and so on. One way in which you're a little more like the Connecticut parents is you refer to your constituencies, but a lot of what you're talking about is trying to go out and persuade employers and service providers and people in the business of giving out grants and the like that they need to comply with the law and this is what the law is and this is how you do it. Well, two responses, Your Honor. First, to go back to the point about Catholic Charities and Connecticut Parents Union, this court recognized in Connecticut Parents Union that costly changes to education programs are an example of an involuntary material burden sufficient to confer standing. So I just want to note that that holding has been reiterated and affirmed by the court. And second, plaintiffs' education work, I don't think that there is a real distinction for the purposes of Article III standing between education services being adversely impacted and direct legal services, for example, which I think is the other example you gave from Catholic Charities, or sorry, from the public charge case. I don't think that there's really a distinction between adverse impacts to those different types of services for the purposes of the standing test. The critical inquiry is whether or not the plaintiffs can show that their activities have been materially burdened in some way that they could not avoid. So here, for example, in order to give... But your second point is that it makes it harder to persuade organizations to do the right thing because now they've changed the rules so that you can no longer go to them and say, see, you've got to do this. Is that really anything like any of these other cases? I do think that the second injury is distinct from the types of injuries discussed in the public charge case, which is similar to plaintiff's first injury. But I still think that plaintiff's injuries in that regard are actually similar to the injuries in Centro. In that case, the plaintiff organization found itself in a situation where it was more difficult for that organization to reach its intended audience, which were day laborers, as a result of a challenged ordinance that would have dispersed those day laborers. So basically, they found it more difficult to access their core constituents, their intended audience, and organize those folks. And similarly here, the notice has made it more difficult for plaintiffs to... But it's done so by changing the law, as opposed to... Would it be the same thing? Would Centro come out the same way if what the organization was doing was challenging a Department of Labor regulation that made it harder in whatever procedural or substantive reason to form a union? Would they have standing to do that? Because it used to be kind of really easy to go out and convince these people that it was good and it would be easy to do and productive to form a union. And now it's going to be harder to sell them the idea because they're going to have a harder road. Their standing from that? I mean, it's a little different than saying we're sort of shunting these folks that we want to organize into a different place where we can't get at them. So it seems to me. I think that the facts are different, but ultimately the impact on plaintiffs' activities are the same. And that's really the core of the test. So is it the case that it's harder for plaintiffs to do what they were doing before? Are they having to spend more time? Have they, as a result of the challenged action... I don't know that you said with respect to SAFE that it was harder. It was just a different focus on state protection as opposed to federal protection. I think that SAGE has had to spend more time on its education efforts as a result of the notice. And I think that that equates to basically the task being more difficult. Is that more time because there are more states? Correct, Your Honor. More time. More time to both keep up with what the state of the law is when the state of the law is basically maintaining a 50-state survey and the states are changing their laws regularly. So just to give one example, Tennessee, just months after the notice was adopted, enacted a law that proactively permits faith-based agencies to discriminate in that state. So the organizations have to spend more time keeping up with the state of the law. So this is for the first injury, educating providers on what their legal obligations are under the law. They've also had to change how they convey that material to service providers. And then with respect to the second injury, SAGE is injured because they are less effective at persuading service providers under the Older Americans Act to take their trainings and follow their guidance on how to provide inclusive services. Bless you. And have, as a result of that, also been forced to divert significant resources towards trying to obtain state-level protections that will replace the 2016 grants rule and perform the same incentivizing function in that regard. All right. Why don't we hear from Governor? Thank you. Thank you again. Thank you. Good morning, your honors, and may it please the court. Jeff Sandberg for the United States. The judgment can and should be affirmed on the authority of this court's holdings in Connecticut Parents Union and prior cases establishing that where the plaintiff is not itself the object or the intended beneficiary of the government action being challenged, which here would be the providers providing services under the HHS grant programs or the LGBT youth experiencing homelessness, foster care children, LGBT elders, where it's not those people before you, but instead an organization who cares about those issues, they need to show under Connecticut Parents Union an involuntary material burden on their activities, which we understand to mean some pre-existing core activities, which we understand to mean some way in which their freedom of action has been restricted, some inhibition in the way they go about doing their substantive work. Has a permit they've applied for been denied? Have the people who they want to meet with been dispersed from roadside labor markets? Have they been excluded from the room where they want to watch proceedings? Something about the way that they do their functions. And Judge Loya, you said that you thought SAGE seemed like a slightly different zebra. And I agree with you in reading the complaint here. I was like, oh, they provide some direct services. I sort of thought the complaint was going to build up to say, you know, Meals on Wheels has gotten more expensive to provide. It's harder to run our shelters or, you know, day activity centers. But none of SAGE's allegations are like that. They're more like family equalities and True Colors allegations that just the—they, as savvy people who care about these issues, are pivoting, adjusting their strategy within their freedom of action to focus and try to do better. And we think that Connecticut Parents Union doesn't allow a plaintiff just to show that they've made some change in their resource allocation. They've expended costs differently, regardless of whether it's a new activity or preexisting activity. I don't think the test is really about whether it's new or preexisting. I think it's about whether the defendant's action has actually had some bite on the organization's activity in some way. Has it dispersed the people they want to meet with? Has it, you know, forced them to hire an attorney instead of a paralegal? Because in DHS, Catholic Charities, to the extent this court made any independent holding as to just Catholic Charities— and I share Judge Lynch's suggestion that perhaps it was a more holistic analysis that was happening there— but Catholic Charities was also filling out adjustment of status applications for folks. And they needed to start bringing on attorneys rather than paralegals to deal with the public charge rule there. So we don't have anything quite like that here. We really have—the injury coming at them that they allege is confusion from complexity in the law and the inability to point to that simple law as a training tool. And I don't think that— You didn't say changes to the education program, which we seem to have recognized at some level in Connecticut Parents Union. Connecticut Parents Union, if you read the body text there, it says where there is an increase in demand for the services provided by the plaintiff. And then footnote 26 drops some examples, including DHS. And without identifying any particular organization, it says where there's costly changes to education programs. But I think if you read the text immediately following that in the Connecticut Parents Union, it says, of course, activities that are undertaken at an organization's own initiative— i.e., choices about resource allocation within their existing freedom of action, as opposed to something forced on them because they can no longer go to the place they want to go to advocate, or they might risk arrest if they go to that place, as in Centro. Then we're talking about something different. So you have to read the whole paragraph of Connecticut Parents Union there in the body text and not just the parenthetical attached to New York v. DHS in the footnote. And I want to alert the Court that ultimately this is, I think, a violent agreement between HHS and the plaintiffs here, and that we share—I mean, President Biden issued on day one an executive order directing all agencies to work to combat, to the extent possible under law, discrimination on the basis of sexual orientation and gender identity. What is the status of the HHS original rule? The 2016 rule has not been—it was rescinded by the 2021 rule, which was itself vacated by a court. So the 2016 rule is in the Federal Register. The 2019 notice also remains in effect. So what it boils down to is the plaintiffs would have us stand on the current two- or three-page 2016 rule, and if we intend that we're going to enforce that again, you know, Texas will reopen its suit dismissed without prejudice in the Southern District of Texas and will litigate all of Texas' objections about statutory authority and RFRA and First Amendment and whatever on this. Or can HHS, you know, work to put together something that it believes is going to, you know, meet and hopefully defeat whatever objections can be launched against it? And that's—HHS is working on the same kind of thing on a number of different fronts right now. There's a Section 1557 notice, which is—I mean, without conceding—without minimizing the amount of money at stake in these grants programs, which is significant, the amount of money poured into federally funded programs and services is even larger. So Section 1557, which governs non-discrimination under—which is a provision of the Affordable Care Act that allows HHS to issue rules banning discrimination. We have interpreted the prohibition on sex discrimination to include gender identity and sexual orientation in an NPRM, and the agency is— You said it a little slower and easier to follow what you're saying. My apologies. My point is just that, you know, we share the policy goals. The agency has kept this notice in place. We understand that the plaintiffs would prefer us to be, you know, forging ahead with enforcing the 2016 rule, but you don't have before you someone who says, you know, I am suffering discrimination because the agency is not enforcing this rule, or even I face an increased risk. They're not suing as next friend to the youth experiencing homelessness. They're saying, as an organization, my job to advocate is getting harder. And we, you know, as permissive as some of the language in this court's past decisions might suggest, it would just be an even further extension, even further bridge to recognize standing in this case. And I really don't see how you could distinguish, you know, the law professor or casebook hypothetical, for example, because that is someone engaged in education who is, you know, incurring costs to update in light of the law. And I think, you know, plaintiffs are quite right that their complaint lays out some concrete allegations about the staff time they have spent and, you know, the articles they have read. It seems like an increased demand on their services. The trainings they have gone to. Well, no. I mean, that's, they're talking about, they're talking about diversion of resources that they undertook themselves. If you look back at Haven's Realty, which is the case that. I don't follow that. You say a diversion that they undertook themselves. How did they undertake themselves? So, maybe I should start here. The law could do that because of the regulatory superstructure. The case law requires there to be an injury coming at them, and then they show some diversion of resources to demonstrate that that injury was not fanciful. That it mattered. It mattered that they can't meet people at the roadside anymore. It mattered that they couldn't get into the room to watch that disciplinary hearing. It mattered that they had to bring on an attorney rather than a paralegal. Haven says, first you show a concrete and demonstrable injury to the organization's activities, the way that they do, the substantive stuff that they do, with a consequent drain on the organization's resources. So, you don't start with allegations of hours spent on something you care about. You start with what is coming at you from a defendant. And here, you have a notice that was crystallizing the agency's practice. The 2016 rule came out in the final days of the Obama administration. And then the Trump administration didn't enforce the 2016 rules. It's subject to litigation. The 2019 notice crystallized and sort of made more public what it had been doing all along. And so, we just think this is the type of thing where an advocacy organization can't show the kind of harm coming at them that you see in a case like Centro or an ordinance. Wouldn't they have had to say during the period of the Trump administration that this is the law, and we think you need to comply with that law. But actually, we've got this further wrinkle that the government isn't going to come after you if you don't comply with this. Wouldn't that be the actual message that they would have to provide? I apologize, Your Honor. I'm not sure I'm entirely following. I mean, I'm not sure that this plan of organization's case would be- Well, you're saying that we had this simple thing, that we could just say, here's the law. It applies across the board. But wouldn't the message actually have been rather more complicated as a practical matter? I mean, if you were a lawyer advising a client as to what are your obligations, one of the things you'd say is, well, we've got this anomalous situation where there are statutory obligations that you absolutely need to comply with. There is this regulatory obligation which may not have applied in your particular- to have to do things that the statute doesn't require you to do. But I need to tell you that the Trump administration has said they're not going to enforce that. Whereas a different organization that was under a different regime, you'd have a complicated message. I'm just trying to get at what got so much more complicated. I think that's right. I think it goes to the fact that clever attorneys can come up with ways of characterizing things to tell a narrative that looks like things are getting from simpler to more complex. It's easy to come up- like if these allegations suffice, I really have a hard time understanding what advocacy organization working on issues that it cares about wouldn't have standing to challenge anything. The problem is I don't see a limit to the appellant's argument with respect to standing, although I'm very receptive to arguments relating to standing. I don't see a limit. I think that's right, Your Honor. And this court's case law says it only has to be a perceptible impairment to the activities. Being excluded from a room where something is happening can be the injury. An increase in the costs that you've incurred to provide your services can be an injury. But I think here what they've pointed to is confusion and complexity. Isn't that exactly what they're alleging? Increasing costs? They're alleging that something happened that they disagree with, and they are choosing to spend more to achieve their ultimate substantive policy goal, which parenthetically, as I noted, we share. It's not as though they're spending money just for fun. No, and a concerned citizen who really cares about health policy and writes letters to his congressman and marches in protest, that person is also not just doing it for fun. They're doing it because they care. But we have policy channels to talk about policy issues, and we have litigation to deal with concrete injuries. Let me go back to Sage, because you and I seem to agree that that's maybe the plaintiff with the strongest case for standing. So I think that the argument is that you have a significant shift forced by the law enforcement notice from federal protection to state protection. And as an organization, we are now required, because there is no general federal protection, to first consider states, all 50 states and territories, but also educate whatever, the recipients, about each state and whatever protections it has or contains for this population. Why isn't that enough? Yeah, I understand the argument. It's a clever argument. They haven't pointed to any court that's ever... It's not a cognizable Article III injury. A decision to change the focus of your advocacy, who you're speaking to, is not the kind of thing that qualifies as an Article III injury. It's even clearer in the D.C. Circuit that that's so. I think the D.C. Circuit case law is a little bit overbroad in saying an injury to advocacy can never give you standing. Because what if someone says, you can't stand on that street corner and impairs your First Amendment rights? You have standing to do that, obviously. But I think the D.C. Circuit is on to something when they say, well, what you're really mad about is that you're not achieving your substantive policy result, as opposed to your clients are being driven away, your costs of printing, your Xerox machine are going up. Things that actually affect the organization, qua organization, rather than someone who cares about issues, there's no line that you can draw. Judge Lee, I share your intuition that the problem with Appellant's argument is that there's no line you can draw. The only case I'm aware of that addressed this sort of federal versus state-by-state, although in a somewhat cursory fashion, is Center for Law and Education in the D.C. Circuit. The plaintiffs there, one of their theories of injury was that they had to pursue more costly state-by-state rather than federal advocacy strategies. And the D.C. Circuit was very dismissive of that argument there. It essentially said, look, you're just complaining about the substantive content of your advocacy. And that's not something we recognize to be cognizable. So I think this is the kind of case that calls out for, you know, an affirmance on the authority of the court's existing holdings. And if there are no further questions, we would ask that the judgment be affirmed. Thank you. So you were very receptive to standing, but what's the limit? Yes, Your Honor. It could be issues with which you are very unsympathetic, where an organization is here before us and says, oh, we had to switch our educational program because the Biden administration did something. I think that the language that could be helpful to the court here can be found in Connecticut Parents Union, where the court asked the question, are the expenses that plaintiffs incurred in response to the challenge to action reasonably necessary to continue their established core activities? In other words, that's the question that allows the court to determine whether or not plaintiffs can avoid the costs that have been imposed on them. And it also answers opposing counsel's concern that these injuries are self-imposed. Here, plaintiffs have shown that it simply takes them more time to do what they were doing before, and that work is not advocacy work. That work is letting the LGBTQ community know what their rights are so that they can more effectively access services when they seek them out. So if you're a same-sex couple trying to become certified as foster parents and you get turned away by Miracle Hill in South Carolina, an evangelical foster care agency, because you're a same-sex couple, you can say, no, I know what my rights are because I've been educated by plaintiffs. But that work takes more time now. And unless they spend the time to do the work, they cannot continue in that very important service. If you're in an organization, just an individual lawyer who practices as a plaintiff's lawyer doing anti-discrimination type work, does that lawyer have standing as an individual to challenge a regulation that does two things. It makes the law more complicated, and so she has to learn more about the law and spend more effort in looking at state remedies where there used to be an easy cause of action under federal law. And it makes it harder to win cases, and there's a direct financial cost to that because the lawyer works on a contingency or on fee shifting, and therefore the lawyer says, I can challenge these new regulations for any number of reasons. I could challenge a new statute because it's unconstitutional, I think, on some substantive ground. I could challenge a regulation because it wasn't adopted properly under the APA, because it makes my life harder as a lawyer. It makes my life harder for my clients. I know that Your Honor referenced the contingency fee basis, and so maybe there might be some impact to the lawyers. It might be a better argument, in effect. I can't win as many cases, so I lose money every year because you've changed the law. I think the critical distinction between these sorts of private attorneys who are providing services to make a living is the connection between their activities and a clear mission. I think if you talk to Ann Vladeck or someone, she would take some umbrage at the idea that her mission is just to make money. The money might be a concrete injury, but she's practicing this kind of law because she wants to advance the interests of discrimination victims. And now they've changed the law to make that harder. Does that give her individual standing, as opposed to whatever standing one of her clients might have, to pursue whatever claim of illegality about whatever the new law is? Right. I think, Your Honor, that I take your point that she obviously believes in the work that she's doing in this scenario, but she's also trying to make a living to earn a salary. Why doesn't that make it an even more concrete injury? You're saying just it's more expensive is part of the problem, and this is really her problem. It might drive her out of business if she can't win enough cases. Isn't it the same thing? It makes it more costly in the first place. I have a lot of standard complaints I used to file, but now I have to make different complaints that rely on different sources of law and so on. It has a burden on my activities and my business. Your Honor, I think I need to think a little bit more about that and think about the particular facts in that kind of case. I do think that organizational standing, while similar to individual standing, requires the plaintiff to show that mission-driven activities have been impaired. I think perhaps if she could sufficiently allege that she very clearly has an established mission, that this is not just a business for her, perhaps she might be able to show standing in that scenario. But I don't think that, even if it's the case that she might be able to meet that test, I don't think that this opens the doors to an unlimited pool of- What about an individual who's charitably inclined, who provides various kinds of services, soup kitchens and things like that, or just is making contributions, and now there's a change in some regulation that makes it harder to do the kind of charitable work that she was doing. The individual would have standing too, I take it, if it's just harder to operate. I'm so sorry, please continue. If you're concerned, Your Honor, that an individual who provides direct social services could have standing under this test, I think that that's a problem for all of organizational standing because organizations show standing by showing that their services have become more time-consuming. For example, in the Moya case, the plaintiff organization there provided direct services to their clients that became more time-consuming as a result of the challenged action in there, which was the denial of disability waivers. Previously, they were helping their clients to submit these waivers. Those waivers were denied, and as a result, they had to spend more time revising and then resubmitting those waivers. So basically, you have a scenario where your pre-existing activity becomes more costly. So I guess the question, you could apply the same hypothetical there. If you had an individual who was similarly doing that kind of work, could they have standing by showing that it's taking them longer to do whatever it is they were doing before as a matter of charity? I think the question there would— I hear your answer. I understand it. Thank you, Your Honor. Thank you very much. Thank you. That concludes today's oral argument calendar and the argument calendar generally. I'll ask the courtroom deputy to adjourn the court.